## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

| | |
|---|---|
| ASHLEY BLACKBURN, | Case No. 4:22CV- 95-JHM |
| Plaintiff, | **COMPLAINT FOR BREACH OF FIDUCIARY DUTY; PREJUDGMENT INTEREST; ATTORNEYS' FEES; AND FOR STATUTORY PENALTIES/FEES FOR FAILURE TO PROVIDE A COPY OF THE ADMINISTRATIVE DOCUMENTS IN VIOLATION OF 29 U.S.C. SECTION 1132(C)(1)(B)** |
| v. | |
| RELIANCE-STANDARD LIFE INSURANCE COMPANY, | |
| **Serve:** CT Corporation System 306 W. Main Street, Suite 512 Frankfort, KY 40601 | |
| BAPTIST HEALTHCARE SYSTEM, INC., | |
| **Serve:** Janet M. Norton 2701 EastPoint Parkway Louisville, KY 40223 | |
| and | |
| DOES 1 through 10, inclusive, | |
| Defendants. | |

Plaintiff, Ashley Blackburn ("Plaintiff"), for her Complaint against Defendants, states as follows:

### **INTRODUCTION**

1.      Plaintiff was a nurse who worked for Baptist Healthcare System, Inc. ("BHS"). Her husband, Ray Blackburn ("Mr. Blackburn"), also worked for BHS. Through their

employment, they were eligible for a variety of benefits, including various forms of group disability and life insurance policies issued to BHS (collectively referred to as the "Plan"). The life insurance was provided by Reliance-Standard Life Insurance Company ("RSL"). Through his employment, Mr. Blackburn obtained life insurance covering himself and Plaintiff. Through her employment, Plaintiff obtained life insurance covering herself and $100,000 in supplemental term life insurance covering Mr. Blackburn. Many people at BHS, including those in the human resources department, knew that Plaintiff and Mr. Blackburn were married and that both worked for BHS. In fact, Plaintiff once asked BHS's human resources manager, Karen Sparks, whether her marriage to a BHS employee affected the supplemental term life insurance option for spouses. Ms. Sparks said that the only limitation was that Plaintiff was restricted to $100,000 in supplemental term life insurance coverage for Mr. Blackburn. This coverage was in addition to the insurance that he had through his own employment with BHS. Mr. Blackburn could obtain similar coverage for Plaintiff. Based on and in reliance upon that information, Plaintiff acquired $100,000 in supplemental term life insurance coverage for Mr. Blackburn. Mr. Blackburn later developed cancer and lost his ability to work. However, through his disability insurance, the life insurance that he acquired through his work at BHS remained in effect. Due to Mr. Blackburn's declining health, Plaintiff took a leave of absence to care for him. When she was not able to return to BHS at the end of her approved leave of absence, her employment ended and she converted the dependent supplemental term life insurance on Mr. Blackburn into an individual life insurance policy, no. RA0831446a (the "Policy").

2.      Unfortunately, Mr. Blackburn died as a result of his cancer. Plaintiff then submitted a claim for the benefits under the Policy but RSL denied her claim, insisting that the Policy was never valid because, under the applicable employee benefit plan, if both spouses are

BHS employees, they are not entitled to coverage under both their own life insurance policy and supplemental life insurance covering the life of a spouse.  This is in direct contradiction to what Plaintiff was informed by BHS's human resources manager.  Plaintiff and Mr. Blackburn had paid for this "double coverage" for ten years and RSL collected premiums for this coverage. Furthermore, Plaintiff paid $4,050 to convert the Policy.  Only upon Mr. Blackburn's death did RSL assert that this coverage was invalid.  An insurer and employer cannot knowingly take years of premiums, assure a plan participant that they are covered and then refuse to pay the benefit when a claim is made and benefits under the Policy/Plan are due.  *See Chelf v. Prudential Ins. Co. of Am.*, 31 F.4th 459 (6th Cir. 2022); *Skelton v. Radisson Hotel Bloomington*, 33 F.4th 968 (8th Cir. 2022); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176 (4th Cir. 2012);  *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351 (5th Cir. 1991); *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934 (9th Cir. 2017); *Sullivan-Mestecky v. Verizon Communications, Inc.*, 961 F.3d 91 (2d Cir. 2020).  That is precisely what BHS and RSL did.  Plaintiff now seeks the benefits that she is entitled to under the Policy.

## THE PARTIES

3.     Plaintiff brings this action for life insurance benefits as the beneficiary of the Policy, which is at issue in this action and which was entered into in the County of Hopkins, Kentucky.  Plaintiff currently resides in that county.

4.     Defendant RSL, at all times relevant, was and is a life insurance company authorized to conduct business in the State of Kentucky, with its home office located in Pennsylvania.  RSL issued the Policy and serves as the claims administrator for claims related thereto.

5.     Defendant BHS, at all times relevant, was, and is, a network of hospitals headquartered in Kentucky that previously employed Plaintiff and Mr. Blackburn.  BHS established an employee welfare benefit plan (the "Plan") to provide benefits for its employees, including Plaintiff.

6.     The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained.  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys or employees of said principals, and all of the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

7.     Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, each of the defendants was the agent, representative, co-conspirator, successor-in-interest, assignee or employee of each remaining defendant, and in doing the things alleged herein was acting within the course and scope of such agency, representation, conspiracy, assignment or employment.

**JURISDICTION AND VENUE**

8.     Plaintiff brings this action to obtain benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-matter jurisdiction over

Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f) and 28 U.S.C. Section 1331.

9.      Venue lies in the Western District of Kentucky, pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the alleged breaches occurred in this district and the ERISA-governed plan at issue was administered in part in this district.

## GENERAL FACTS AND ALLEGATIONS

10.      Plaintiff and Mr. Blackburn married on October 24, 2003, Plaintiff's 21st birthday.  They have four children.

11.      On June 8, 2009, Plaintiff started working at BHS as a nurse.  Mr. Blackburn also worked at BHS.

12.      Through their employment at BHS, both Plaintiff and Mr. Blackburn obtained various employee benefits such as disability insurance and life insurance.

13.      To monitor their employee benefits, to apply for them and to make changes to them (among other reasons), they were provided an "employee portal" to which they had access by logging into the portal.  BHS arranged for the employee portal to be created for its employees in part to convey information about employee benefits to its employees.

14.      Like many BHS employees, Plaintiff had questions about her benefits under the Plan.  One of the important duties of BHS's human resources manager is to assist employees with such matters.  During the relevant times in question, the human resources manager was Karen Sparks.  Plaintiff and Mr. Blackburn spoke with Ms. Sparks on multiple occasions about their benefits.

15.      Ms. Sparks knew that Plaintiff and Mr. Blackburn were married and that they

both were employed by BHS.  They had discussed such matters on multiple occasions.  On one

occasion, Plaintiff asked Ms. Sparks about whether her marriage to Mr. Blackburn affected their

ability to obtain supplemental life insurance on each other in addition to the insurance they

already had through their employment.  Ms. Sparks informed them that the marriage's only

effect on their ability to insure each other was that it would limit the amount of coverage that

they could obtain.  They could only obtain up to $100,000 in supplemental coverage for their

spouse.  This was in addition to the $500,000 in coverage they could obtain for themselves.

16.     Both Plaintiff and Mr. Blackburn obtained life insurance from RSL, covering

themselves, with the other listed as the beneficiary.  They also obtained supplemental term life

insurance on each other.  Mr. Blackburn obtained supplemental life insurance covering Plaintiff

and Plaintiff obtained supplemental life insurance covering Mr. Blackburn.  Plaintiff obtained the

Policy, $100,000 in supplemental term life insurance, with Mr. Blackburn as the insured and her

as the beneficiary.  They paid for these various forms of insurance for over 10 years and both

BHS and RSL collected premiums on the supplemental life insurance coverage, including the

Policy.  This coverage was in addition to the $500,000 in coverage that he had on himself

through his employment.

17.     As part of an annual enrollment process, on one occasion, Plaintiff accidentally

attempted to enroll Mr. Blackburn for $500,000 in supplemental term life insurance coverage.

Ms. Sparks and the BHS human resources department became aware of the mistake and

informed Plaintiff and Mr. Blackburn that they had to reduce the application to $100,000 in

coverage precisely because they were married.  Plaintiff was always completely transparent and

open with anyone whom she dealt with on matters involving coverage and her relationship with

Mr. Blackburn.  At no time did anyone at BHS inform Plaintiff or Mr. Blackburn that the Policy

was invalid because they were married and both had supplemental term life insurance coverage covering each other.

18.      Unfortunately, Mr. Blackburn developed cancer and due to his condition, he slowly lost the ability to work.  Through his work, Mr. Blackburn had acquired long-term disability insurance.  He eventually ceased working and started receiving disability benefits.  Through his disability insurance, the life insurance and his supplemental term life insurance coverage from his then-former employment with BHS was maintained.

19.      As Mr. Blackburn's condition worsened, Plaintiff spent increasingly longer periods of time away from work to tend to him.  On November 30, 2019, she applied for and was given a leave of absence from BHS to care for her husband.

20.      When Plaintiff's available leave came to an end, Mr. Blackburn had not recovered from his cancer and, in fact, his condition had worsened.  Because she could not return to her employment and she knew that he would have great difficulty obtaining additional life insurance after he recovered from his cancer, Plaintiff sought to port the life insurance that she had obtained for him through her employment.  However, RSL insisted that she actually had to convert the supplemental term life insurance into an individual whole life insurance policy.  As such, per RSL's instructions, and with BHS's assistance, she converted the coverage.

21.      Plaintiff encountered great difficulty in converting her then-existing supplemental term life insurance into what would become the Policy.  She worked extensively with Ms. Sparks in BHS's human resources department to convert her coverage.  Ms. Sparks knew that Mr. Blackburn was insured under his own policy and under Plaintiff's then-existing supplemental term life insurance.

22.      On December 17, 2019, Plaintiff submitted a "Group Life Conversion

Application." In the application, she explained that she had ceased working due to being "unable to return from leave." She sought to maintain the $100,000 in insurance under the Policy for her "spouse," Mr. Blackburn. *This form was signed and approved by Ms. Sparks.*

23.     In a letter dated January 13, 2020, Protective Life Insurance Company ("Protective"), an administrator for RSL, explained to Plaintiff that the Policy would take effect once she submitted a payment for the Policy's premiums and RSL had completed the verification process. Per the letter's request, on January 14, 2020, Plaintiff sent RSL a check for $4,050.[1] This paid for annual premium due under the Policy. Effective January 1, 2020, RSL converted and issued the Policy representing that she had coverage under the Policy.

24.     Shortly thereafter, on March 30, 2020, Mr. Blackburn passed away. He died of "acute hypoxemic respiratory failure," "probable fungal pneumonia," anuric renal failure, a subdural hematoma and subarachnoid hemorrhaging.

25.     On April 1, 2020, Protective sent a letter to Plaintiff enclosing the new converted individual Policy and thanking her for her association with RSL.

26.     On May 5, 2020, Plaintiff submitted a claim for the $100,000 of benefits due under the Policy.

27.     In a letter dated June 18, 2020, RSL denied the claim (the "Denial Letter") on the basis that it did not know that Mr. Blackburn worked for BHS and had his own policy as an employee. It then quoted language from the Policy/Plan that states:

> Nothing in this section will change or affect any of the terms of this Policy other than as specifically set out in this section. All the Policy provisions not in conflict with these provisions shall apply to this section.

---

[1] The check actually states that it was made on January 14, 2019. This is due to an error that Plaintiff made when dating the check, as often occurs when dates are provided in January of each year.

When an insured Dependent dies, we will pay the applicable benefit shown on the Schedule of Benefits to the Insured. If the Insured is deceased, then the benefit will be paid to the Insured's beneficiary. Only dependents who meet the definition of Dependents can be insured for this benefit.

***A person may not have coverage both as an Insured and as an insured Dependent. Only one eligible spouse may cover the eligible children as Insured Dependents. The spouse may be covered as a dependent if not covered as an Insured.*** (Emphasis in original.)

28.     RSL explained that, because Mr. Blackburn was covered under a different policy under the Plan, Plaintiff was not entitled to the benefits under the Policy.  It notified Plaintiff that it had instructed its administrator, Protective, to "rescind" the Policy.  It stated that it would refund the premiums that Plaintiff paid for the Policy.  It then refunded the $4,050 that she had paid in January 2020.

29.     As explained above, Plaintiff had insured Mr. Blackburn for over ten years and BHS and RSL collected premiums for the Policy during this time and consistently approved coverage even though, when a claim arose under the exact same plan but with a converted version of that policy, it insisted that coverage had never existed.  This was in direct contradiction to what Plaintiff had been informed was permitted by BHS's human resources manager.

30.     Neither RSL nor BHS ever refunded the over-10-years' worth of premiums for insurance that RSL now insists was never in effect.  For 10 years, BHS and RSL lulled Plaintiff – and Mr. Blackburn, for that matter – into believing that such cross-coverage was allowed.  They collected over 20 years' worth of combined premiums from the Blackburns.  Both Defendants have benefited greatly but failed to refund even a fraction of the premiums collected from Plaintiff and her late husband.  RSL financially benefits by keeping the premiums.  BHS benefited by reaping the benefits of having a successful employee benefits program.  *See*

*Boseman v. Connecticut General Life Ins. Co.*, <u>301 U.S. 196, 204</u> (1937) ("Employers regard group insurance not only as protection at low cost for their employees **but also as advantageous to themselves in that it makes for loyalty, lessens turn-over and the like**.")  (Emphasis added.)

31.     On July 22, 2020, Plaintiff, through her attorneys, appealed the denial of her claim.  The appeal letter explained:

> It is our understanding from your letter that the denial of the claim for life insurance benefits is due to Mr. Blackburn having been an employee at Baptist Healthcare and therefore not eligible to be covered under a policy owned by his wife.

> This may be your policy as stated in your letter; however, Ashley Blackburn obtained life insurance on her children and her spouse when she began her employment with Baptist Health over ten (10) years ago. She was never told it was not permissible to have a policy on her spouse as he too was a nurse at Baptist Health. In fact, he also had a policy on his wife's life. You received and took her premium payments on the term life insurance she obtained on her spouse for over ten (10) years.

> In the fall of 2019 Mrs. Blackburn spoke with the HR Department at Baptist Health in Madisonville to convert the policy to a whole life policy. At this time, Mr. Blackburn had been diagnosed with cancer and the conversion was needed due to my client believing that it would be difficult, if not impossible to obtain life insurance on her husband at a later date. It was believed Mr. Blackburn would recover. So during a very difficult time for her family, during her husband's cancer treatments, Mrs. Blackburn spent a great deal of time getting the policy converted, as she believed it to be a prudent thing to do. She was going to be taking a leave from Baptist and she was told the conversion was also needed to continue the policy as she would not be employed by Baptist and able to maintain the dependent group policy.

> No one at Baptist Health or in your underwriting department ever mentioned your policies regarding dependent insurance. Not during the application for the initial group dependent policy, nor during the conversion process. Obviously, the HR Department at Baptist knew Mr. & Mrs. Blackburn were both employed by Baptist. When they were discussing the conversion, they also discussed Ray and his treatment. The underwriting department also knew as Mrs. Blackburn was clear when she spoke with them they were both employed at Baptist.

> Mrs. Blackburn has relied on you receiving premium payments for over ten (10) years, plus an annual payment for the newly converted policy, that this insurance

policy existed on the life of her husband. Mrs. Blackburn was never told that she was not able to obtain insurance on her spouse. You took her premium payments for over ten (10) years, accepted her conversion, and took her conversion policy payment. Now when she files a claim on the life of her husband, she is told that the policy should never have been written - although it existed for over ten (10) years. That is certainly not her fault, nor anything she could have had knowledge of.

32.     In a letter dated September 17, 2020, RSL denied Plaintiff's appeal (the "Denial of Appeal"). The appeal was denied for the same reason that the initial claim was denied. Of note, RSL never once acknowledged that, in fact, before it issued the Policy, Plaintiff had disclosed her marital status, and Mr. Blackburn's status as an insured, to everyone whom she interacted with during the application process.

33.     RSL's and BHS's actions in this matter were a breach of their fiduciary duties to Plaintiff and Mr. Blackburn. Courts throughout the country, including the Sixth Circuit, have found that conduct such as RSL's and BHS's were a breach of fiduciary duties. *See Chelf*, 31 F.4th 459; *Skelton*, 33 F.4th 968; *McCravy*, 690 F.3d 176; *Pitts*, 931 F.2d 351; *Salyers*, 871 F.3d 934; *Sullivan-Mestecky*, 961 F.3d 91; *Delker*, 2022 WL 38468. When an employer and an insurer take premiums for coverage and confirm the existence of that coverage, and the insured/beneficiary relies on those actions, the insurer and the employer cannot subsequently refuse to pay the claim when the benefits are due. Here, Plaintiff and Mr. Blackburn each paid premiums on their life insurance coverage, including for the Policy, for over 10 years. Plaintiff paid for yet an additional annual premium for the coverage when she converted the Policy. Not only did Defendants confirm coverage, but, when Plaintiff and Mr. Blackburn inquired about the effects of their marriage on entitlement to that coverage, BHS's human resources manager specifically stated that they could obtain the coverage that they paid for. Only upon Mr. Blackburn's death did RSL state that coverage was not available under the Plan. This is precisely the type of conduct that is both improper and forbidden by law.

34.     In *Chelf*, the Sixth Circuit explained that the handling of an ERISA plan's premiums was a fiduciary act and that the mishandling of premiums was potentially a breach of the relevant fiduciary's duties.  *See* 31 F.4th at 466-67.  The court reasoned that by deducting premiums, the employer exercised control over plan assets, which made it a functional fiduciary. The improper deduction of these premiums alone qualified as a breach of fiduciary duty.  *See id*. at 466.

35.     Here, BHS and RSL both took and handled Plaintiff's premiums.  Before the conversion of the Policy, BHS deducted premiums from Plaintiff's pay and transmitted them to RSL.  It also addressed enrollment for benefits.  Its human resources manager, Ms. Sparks, addressed questions, and its employee portal handled enrollment.  Ms. Sparks also assisted with the conversion of the Policy.  She was aware that Plaintiff and Mr. Blackburn were married and employees of BHS, and what types of insurance they maintained.  During the conversion process, RSL accepted Plaintiff's premiums and Plaintiff's application to convert the Policy from its original term life format to its current whole life format.  In light of *Chelf*, both entities, acting as administrators, mishandled plan funds (i.e., Plaintiff's premiums).

36.     A similar result was reached by the Eighth Circuit in *Skelton* in which RSL was found to have violated its fiduciary duties owed to the Plaintiff when it, like it did here, failed to set up a premium collection system that would not charge applicants who were not eligible for insurance coverage.  In *Skelton*, the plaintiff sued an insurer and his employer for mishandling his wife's enrollment for life insurance and then declaring her ineligible for it after she died.  33 F.4th at 971.  The Eighth Circuit held that the insurer, Reliance Standard, acted as a fiduciary and breached fiduciary duties because it mistakenly charged premiums to an employee even though the insurer never approved the employee's application (because she failed to submit

evidence of insurability).  The court held that the insurer owed a duty to set up a premium

collection system that would not charge applicants who were not approved for insurance

coverage.  It held that "as a fiduciary for determining eligibility and enrolling eligible

individuals—while ultimately receiving employees' premiums—Reliance Standard had a duty

. . . to verify that those premiums came only from eligible, enrolled employees." *Id*. at 976-77.

It further noted that acceptance of premiums when coverage was lacking was a

misrepresentation.  *See id*. at 976-78.

37.     These results are reasonable in light of the incentive for insurers to misrepresent

coverage and keep improperly obtained premiums.  As the court in *McCravy v. Metropolitan Life*

*Ins. Co*., 690 F.3d 176, 182-83 (4th Cir. 2012) explained:

> In sum, with *Amara* [*CIGNA Corp. v. Amara*, 131 S.Ct. 1866 (2011)], the
> Supreme Court **clarified that remedies beyond mere premium refunds--**
> **including the surcharge and equitable estoppel remedies at issue here--are**
> **indeed available to ERISA plaintiffs suing fiduciaries under Section**
> **1132(a)(3)**. This makes sense--otherwise, the stifled state of the law interpreting
> Section 1132(a)(3) would encourage abuse by fiduciaries. **Indeed, fiduciaries**
> **would have every incentive to wrongfully accept premiums, even if they had**
> **no idea as to whether coverage existed--or even if they affirmatively knew**
> **that it did not. The biggest risk fiduciaries would face would be the return of**
> **their ill-gotten gains, and even this risk would only materialize in the (likely**
> **small) subset of circumstances where plan participants actually needed the**
> **benefits for which they had paid. Meanwhile, fiduciaries would enjoy**
> **essentially risk-free windfall profits from employees who paid premiums on**
> **non-existent benefits but who never filed a claim for those benefits**. With
> *Amara,* the Supreme Court has put these perverse incentives to rest and
> paved the way for McCravy to seek a remedy beyond a mere premium
> **refund**. (Emphasis added).

38.     Here, as explained above, RSL fully embraced these "perverse incentives" and

has collected over 20 years' worth of premiums that it has not refunded (10 years of premiums

on Plaintiff's Policy and 10 years of premiums on Mr. Blackburn's supplemental life policy).  It

thus profited substantially by: 1) misrepresenting the coverage under these supplemental life

policies; 2) setting up a system designed to collect premiums on "invalid" policies; and 3) actually collecting these premiums for many years.

39.     The Denial of Appeal also explained that this was RSL's final position on the matter and that Plaintiff had the right to sue for her benefits under the Policy.

40.     In three letters dated March 18, April 12 and May 17, 2022, Plaintiff requested copies of the Plan documents from BHS.  These requests were made pursuant to Section 503 of ERISA, 29 U.S.C. Sections 1024(b)(4) and 1133 and applicable Department of Labor Regulations, including 29 C.F.R. Section 2560.503-1(h)(2)(iii).  These requests sought various documents, including:

> All Plan documents, including but not limited to, her group policy, insurance certificates, summary plan descriptions, master Plan description, summary annual report, trust agreement, contracts, endorsements, amendments, riders or other instruments under which the Plan is established or operated, other related documents that were in force and applicable to the claim(s) at issue, any amendments and statements of material modification thereto. . .
> All correspondence or communications from any person, company employee, attorney, accountant, or other service provider employed or retained to render advice on behalf of the Plan/Policy or its fiduciaries regarding the Plan/Policy, including termination of the Plan/Policy.

41.     BHS never responded to the letters or the requests for documents except that, on May 13, 2022, BHS, through Ms. Sparks, provided a copy of the Policy (no other documents were ever provided) pursuant to a direct call from Plaintiff's counsel.  To date, Plaintiff has not received many of the documents that she sought and is entitled to pursuant to ERISA regulations.

### FIRST CLAIM FOR RELIEF

Breach of Fiduciary Duty and Request for Equitable Relief Including Waiver, Estoppel, Reformation and Surcharge, and for Attorneys' Fees and Pre-Judgment Interest, under an ERISA Plan – 29 U.S.C. Sections 1132(a)(3)(B), (g)(1)
(Plaintiffs against all Defendants)

42.     Plaintiff incorporates by reference each of the foregoing paragraphs of this complaint, as though fully set forth herein.

43.     ERISA Section 502(a)(3), 29 U.S.C. Section 1132(a)(3)(B), permits plan participants like Plaintiff to bring a civil action against fiduciaries like Defendants to obtain "other appropriate equitable relief," including the equitable remedies of waiver, reformation, estoppel and "surcharge" (i.e., make-whole relief), in order to redress the fiduciaries' violations of ERISA or an ERISA plan.

44.     At all times relevant herein, a fiduciary relationship existed between Plaintiff, BHS and RSL, the latter two being ERISA plan fiduciaries.  Defendants funded and administered enrollment, claims and benefits provided to BHS's employees by issuing the Policy that insured BHS's employees and their dependents, including Plaintiff and her family.  BHS's employees handled enrollment of the Policy before the conversion of the Policy, addressed questions related to the conversion of the Policy and collected premiums for the Policy for at least 10 years before it was converted. BHS and RSL handled premiums after the conversion application was submitted.  It also reviewed and approved the conversion application.  Defendants have, and at all times relevant had, the authority to grant or deny claims, including Plaintiff's claim for benefits under the Policy.  BHS and RSL both have exercised the authority to determine eligibility and, in doing so, acted as the Plan and claims administrators with respect to the Policy.

45.     BHS at all relevant times acted as the agent for RSL when it communicated with Plaintiff and Mr. Blackburn concerning, among other things, procurement of the Policy, eligibility issues concerning the Policy and conversion of the Policy to an individual policy.  *See Salyers*, 871 F.3d at 938 (finding the employer was the agent of the insurer/claims fiduciary for purposes of handling premium, eligibility and enrollment issues relating to the ERISA plan at

issue). Under agency theory, a principal cannot argue ignorance of a lack of coverage where its agent had such knowledge.

46.     Because Defendants exercise decision-making authority regarding claims and eligibility under the Plan and Policy, they act as fiduciaries in the claims-handling process and in the administration of the Plan and the Policy. *See* 29 U.S.C. § 1002(21)(A)(i), (iii) ("a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan").

47.     Defendants, as ERISA fiduciaries for the Policy and the group Plan, had a fiduciary duty to properly advise Plaintiff on the Policy's enrollment requirements, conversion rights and eligibility for coverage under the Plan and the Policy. Defendants owed Plaintiff a duty of utmost loyalty and care to serve, in good faith, in a manner that was in Plaintiff's best interests. As fiduciaries, Defendants owed Plaintiff a duty to administer the Plan solely in Plaintiff's interest, not in their own. Defendants owed a duty to disclose material facts concerning the Plan, accurately provide truthful information and advice to Plaintiff and to not mislead Plaintiff regarding material information about benefits or Plan terms, so that Plaintiff could make appropriate decisions about coverage under the Plan. Not only did Defendants wait to notify Plaintiff of Mr. Blackburn's uninsurability until after he died, but, in fact, BHS and RSL actively misinformed Plaintiff that Mr. Blackburn *could* be insured.

48.     Defendants owed fiduciary duties to affirmatively provide information about benefits that they knew or should have known would be harmful to withhold based on their knowledge of the specific participant's situation. This included a fiduciary obligation to provide

complete and accurate information that was material to the circumstance, even when a beneficiary has not specifically asked for the information.  Finally, it included a duty to investigate suspicions that Defendants had, or should have had, and alert the Plan participants and beneficiaries to any doubts that the fiduciaries had about matters that may have adversely impacted Plaintiff's benefits, such as Mr. Blackburn's eligibility for supplemental coverage under the Policy.

49.     Defendants also owed Plaintiffs a duty to hire, train and supervise their personnel to anticipate confusion over eligibility for Plan benefits and coverage: "because it is foreseeable if not inevitable that participants and beneficiaries will have questions for plan representatives about their benefits, our cases also recognize an obligation on the part of plan fiduciaries to anticipate such inquiries and to select and train personnel accordingly." *Kenseth v. Dean Health Plan, Inc*., 610 F.3d 452, 471-72 (7th Cir. 2010).

50.     As explained above, BHS and/or RSL breached their fiduciary duties by the following, among other, conduct:

- Misleading Plaintiff by informing her that Mr. Blackburn was covered for $100,000 of death benefits and by accepting premium payments priced at that amount of coverage, without advising Plaintiff of alleged deficiencies in the coverage, including the assertion that Mr. Blackburn did not meet the Policy's and the Plan's requirements;
- Mishandling Plaintiff's premiums for coverage under the Policy when they had discretion to take premiums and address matters of enrollment.  *See Chelf*, 31 F.4th at 466-67;
- Actively informing Plaintiff that Mr. Blackburn could be covered for supplemental life insurance when Plaintiff inquired as to whether additional coverage was available under the Plan;

- Breaching their "fiduciary duty to ensure its system of administration did not allow it to collect premiums until coverage was actually effective." *Skelton*, 33 F.4th 968, 973 (internal quotations omitted);

- Failing to carefully review enrollment applications to determine whether they were complete and whether all intended beneficiaries could be covered under the Policy. Alternatively, Defendants should have known such, or investigated the applications, so that they could determine eligibility, but they did not do so until after the covered loss occurred, in breach of their fiduciary duties;

- Failing to anticipate that Plan participants would be confused about the ability to enroll a person in the Policy, when, in fact, that person was arguably ineligible for benefits under the Policy, and failing to have a more proactive procedure in place to ensure that Plan participants and beneficiaries such as Plaintiff would only enroll for benefits for which they were actually eligible prior to paying premiums and confirming coverage;

- Failing to anticipate that Plaintiffs and other Plan participants who select such insurance would assume that benefits enrollment statements and the acceptance of premiums would be considered proof of the existence of coverage; and

- Any other ways as alleged above or unknown to Plaintiff at this time, but which become apparent throughout the course of this litigation.

51.     The Code of Federal Regulations establishes minimum requirements for employee benefit plan procedures pertaining to claims for benefits for plan fiduciaries such as Defendants.  29 C.F.R. Sections 2560.503-1(b)(2), (5) require a reasonable claim procedure to contain administrative processes and safeguards designed to ensure and verify that benefit claim determinations are made in accord with plan documents.  It was enacted to implement ERISA's statutory declaration of policy in 29 U.S.C. Section 1001(a) that adequate disclosure be made and safeguards be provided with respect to the administration of ERISA plans because of the

lack of knowledge on the part of ERISA plan participants and beneficiaries like Plaintiff.

Defendants' failure to construct a system that ensured that coverage is properly in place before

premium payments are accepted violated the requirement that safeguards be in place to ensure

adequate administration of the Plan (i.e., the Policy that they funded and administered) and that

benefit claim determinations be made in accordance with the Plan documents.  This ERISA

violation breached Defendants' fiduciary duties owed to Plaintiff.

52.     ERISA plan participants and beneficiaries can assert a claim against fiduciaries

like BHS and RSL for breach of fiduciary duty under 29 U.S.C. Section 1132(a)(3), and the

available remedies to redress those breaches and ERISA violations include equitable remedies

such as surcharge, waiver and estoppel, and reformation.  *See McCravy*, 690 F.3d at 180.

53.     Defendants' breach of their fiduciary duties and other ERISA violations described

above proximately caused the denial of Plaintiff's benefits, and Plaintiff is therefore entitled to

compensatory damages and/or life insurance benefits in the amount of $100,000 under the

equitable remedies of waiver, estoppel, reformation and surcharge, among others.

54.     As a direct and proximate result of Defendants' breach of their fiduciary duties,

Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to

reimbursement of those fees pursuant to 29 U.S.C. Section 1132(g)(1).

*Waiver/Estoppel Remedy*

55.     Defendants are estopped from asserting and/or have waived their right to assert

lack of coverage, because Defendants confirmed coverage to Plaintiffs, led Plaintiff to believe

that she had valid coverage and would be paid the death benefit if and when Mr. Blackburn

passed away and through their acceptance of premiums under the Policy for $100,000 in

coverage.

56.     Plaintiff reasonably and detrimentally relied on Defendants' written and oral misrepresentations in believing that she was fully covered and that Plaintiff would receive all of the benefits elected and paid for.

57.     Courts have applied waiver and estoppel where the insurer accepted premium payments with the knowledge that the insured did not meet the requirements for coverage.  *See Pitts*, 931 F.2d at 357 (waiver where the insurer accepted payments after learning of the plan participant's breach of policy requirements); *Salyers*, 871 F.3d at 938 (finding waiver and estoppel where the administrator accepted higher premium payments but later denied higher death benefits).  Under agency theory, a principal cannot argue ignorance of a lack of coverage where its agent had such knowledge.

58.     Based on the facts alleged above, Defendants intentionally, knowingly and voluntarily relinquished their right under the Plan to assert that Plaintiff and Mr. Blackburn were not eligible for coverage and that it could be rescinded.  Defendants did not notify Plaintiff of a lack of coverage until after the covered loss occurred.  Defendants knew of the Plan requirements and knew that Mr. Blackburn and Plaintiff had separate life insurance policies and had supplemental life insurance coverage on each other  yet never informed Plaintiff or Mr. Blackburn that this was prohibited under the Policy and the Plan.  BHS and RSL knew it had issued the Policy with $100,000 in coverage being purchased by Plaintiff, knew that she was paying premiums for that coverage, made many affirmative statements of coverage and admittedly received and accepted premium payments for the coverage without telling her that her husband was ineligible for the coverage until after the covered loss occurred.  RSL only tried to enforce these requirements when it was to its financial benefit to do so – that is, after Plaintiff

suffered a covered loss.  That conduct constitutes a voluntary relinquishment of the right to insist

on denial of coverage, i.e., to not provide Mr. Blackburn with double coverage.

59.     Giving effect to the waiver in this case does not expand the scope of the ERISA

Plan.  Rather, it provides the Plaintiff with an available benefit for which she paid.

*Reformation Remedy*

60.     Plaintiff is entitled to the equitable remedy of reformation to conform the Policy

in accord with Plaintiff's reasonable expectations, i.e., such that the Policy provided coverage for

Mr. Blackburn's life and that she is entitled to the Policy's death benefit of $100,000.

61.     Reformation is appropriate where one party is mistaken that an ERISA policy

provides coverage, and the other party commits fraud or engages in inequitable conduct.  *See*

*Sullivan-Mestecky*, 961 F.3d at 103.

62.     The Plaintiff, at all relevant times, was mistaken that the Policy provided

dependent life insurance coverage on Mr. Blackburn's life.  If RSL is correct, Mr. Blackburn was

not eligible for the dependent life insurance coverage under the Policy and, therefore, it did not

cover him at the time he died.

63.     Defendants committed equitable fraud and engaged in inequitable conduct as

alleged above.  Among other things, the Defendants misrepresented to Plaintiff that Plaintiff and

Mr. Blackburn were covered under the Policy for his life, including without limit when they

repeatedly deducted and then accepted his premium payments for the Policy's dependent life

coverage knowing that Plaintiff and Mr. Blackburn had dependent supplemental life insurance

coverage on each other and knowing that the Policy did not provide the dependent coverage. The

Defendants lulled Plaintiff and Mr. Blackburn into a false sense of security that her coverage on

Mr. Blackburn was in place when it did not under the Policy's terms, likely intentionally so they

could continue to profit by his premium payments. The reasonable inference from their conduct is that they intended to take his premiums forever and hope that he would not make a claim. Or they were willfully ignorant because it was to their financial benefit.  At minimum, they were despicably careless and grossly negligent in failing to inform Plaintiff and Mr. Blackburn that his group dependent life coverage was invalid and in continuing to take his premiums and, therefore, acted inequitably.

64.     As a result of Defendants' fraudulent representations and inequitable conduct, Plaintiff reasonably but mistakenly expected that she would be covered under the Policy and would receive the death benefit if Mr. Blackburn passed while the Policy was in force.  The Defendants are sophisticated experts on their own Plan and Policy.  They knew that Plaintiff and Mr. Blackburn both were employed by BHS, yet they continued to collect premiums every year for at least 10 years and then again after conversion of the Policy.  Plaintiff reasonably relied on these representations of coverage.

65.     These representations were sufficient to bind Defendants to their fraudulent representations and inequitable conduct.  Reforming the Policy to accord with Plaintiff's reasonable expectations is an appropriate equitable remedy. The power to reform contracts is a traditional power of an equity court, not a court of law, and is appropriate relief in ERISA.  *See Amara*, 563 U.S. at 439-442.

*Surcharge Remedy*

66.     Plaintiff is entitled to the equitable remedy of surcharge, i.e., to be made whole after Defendants breached their fiduciary duties to her, including both compensatory damages for actual harm caused by Defendants' breach of fiduciary duties and the amount that RSL and BHS have been unjustly enriched.  *See Cigna Corp. v. Amara*, 563 U.S. 421, 436-45 (2011).

67.     As to compensatory damages, a "[t]he beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the [fiduciary's] breach." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012).  Plaintiff has been actually harmed in the amount of at least $100,000 and is entitled to collect that amount from Defendants and to be made whole as a surcharge.

68.     As to unjust enrichment, "a fiduciary who gains a benefit by breaching his or her duty must return that benefit to the beneficiary." *Id.*  Defendants gained the benefit of retaining Plaintiff's premium payments and the Policy's death benefit for a dependent life insurance benefit because they breached their fiduciary duties as alleged hereinabove.  Defendants must return those premium payments to Plaintiff, as well as any wrongfully obtained profits in an amount of at least $100,000.

## SECOND CLAIM FOR RELIEF

For Statutory Fees for Failure to Provide a Copy of the Administrative File
in Violation of 29 U.S.C. Section 1132(c)(1)(B)
(Plaintiff Against BHS and DOES 1 through 10)

69.     Plaintiff incorporates by reference each of the foregoing paragraphs of this complaint, as though fully set forth herein.

70.     On March 18, April 12 and May 17, 2022, Plaintiff sent letters to BHS, Plaintiff's former employer and the ERISA Plan administrator.  The letters requested a complete copy of the claim file, including copies of all documents, records and other information relevant to her claim for benefits, as well as all Plan documents, all Plan summaries, all relevant correspondence and communications and all documents relating to Plaintiff's election for and payment of premiums for her benefits under the Policy.

71.     In each letter, Plaintiff sought a variety of documents, including:

- All Plan documents, including but not limited to, her group policy, insurance certificates, summary plan descriptions, master Plan description, summary annual report, trust agreement, contracts, endorsements, amendments, riders or other instruments under which the Plan is established or operated, other related documents that were in force and applicable to the claim(s) at issue, any amendments and statements of material modification thereto and any documents.

- All correspondence or communications from any person, company employee, attorney, accountant, or other service provider employed or retained to render advice on behalf of the Plan/Policy or its fiduciaries regarding the Plan/Policy, including termination of the Plan/Policy.

72.     Plaintiff also informed BHS that the Department of Labor regulations under ERISA Section 503, 29 U.S.C. Section 1133, require that these documents be provided free of charge.  29 C.F.R. § 2560.503-1(h)(2)(iii).  Moreover, the regulations further require that the documents be provided within thirty (30) days, or the plan administrator may be liable for penalties of up to $100 per day.  29 U.S.C. § 1132(c); 29 C.F.R. § 2575.502c-1.

73.     When a court assesses statutory penalties under ERISA, it exercises its discretion. A court considers the following factors:

> Appropriate factors to be considered . . . include 'bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary.' . . . Other circuits have studied the role of prejudice or damages to the inquiry and have concluded that although they are often factors, neither is a *sine qua non* to a valid claim under [Section 1132(c)(2) ].

*Hemphill v. Estate of Ryskamp*, 619 F.Supp.2d 954, 975-76 (E.D. Cal. 2008) (quoting *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3rd Cir.2002)), *modified sub nom.*, *Hemphill v. Pers. Representative of Estate of Ryskamp*, No. CVF-05-1319 OWW/SMS, 2008 WL 1696722 (E.D. Cal. Apr. 8, 2008).

74.     As the Eighth Circuit discussed in *Brown v. Aventis Pharmaceuticals, Inc.*, 341 F.3d 822 (8th Cir.2003), while an employer's good faith and the absence of harm are relevant to

the assessment of whether to award damages, lack thereof does not preclude the award.  *See id.* at 825.  There, the court found that Brown did suffer a loss due to the delay and the investment of time, effort and money, including hiring an attorney, just to gain access to information that Brown was legally entitled to.  *Id.*  Ultimately, the court concluded that it was not an abuse of discretion for the district court to award the maximum damages.

75.    Here, BHS failed to respond to Plaintiff's requests at all, failing to provide the necessary Plan documents, summaries and other information regarding premium payments and elections for benefits, as requested by Plaintiff.  Such information is relevant to how premiums are handled and potential matters involving agency.  As noted above, Plaintiff explained the request in detail and sent it to BHS on three different occasions.  Plaintiff expected to receive a response from BHS by April 18.  Plaintiff received no response or documents.  Plaintiff managed to obtain a copy of the Policy by calling Ms. Sparks, but the latter could not provide the other documents and, to date, Plaintiff has yet to receive them.

76.    BHS violated Plaintiff's rights under ERISA and violated 29 U.S.C. Section 1132(c)(1)(B), thereby depriving her financially.  Plaintiff is entitled to up to $110 per day and whatever additional relief this Court deems proper.

77.    Plaintiff alleges all of the same conduct against Defendants DOES 1 through 10 as she does against BHS in this Second Claim for Relief and in this complaint.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For equitable relief, including waiver, equitable estoppel, reformation and surcharge in the amount of at least $100,000 and/or return of the premiums paid on the Policy before conversion of the Policy.

2.    For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).

3.    For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred.  *See Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992).

4.    Up to $110 per day and whatever additional relief this Court deems proper for violation of 29 U.S.C. Section 1132(c)(1)(B).

5.    For such other and future relief as this Court deems just and proper.

Dated:  August 5, 2022                       SULLIVAN MOUNTJOY, PSC

                                             /s/ Ronald M. Sullivan
                                             Ronald M. Sullivan, KBA #69080
                                             R. Michael Sullivan, KBA #84039
                                             100 St. Ann Street
                                             Owensboro, KY 42303
                                             (270) 926-4000 – telephone
                                             (270) 683-6694 – facsimile
                                             rsullivan@smlegal.com – email
                                             msullivan@smlegal.com – email

                                             McKENNON LAW GROUP PC
                                             Robert J. McKennon
                                             Nicholas A. West
                                             20321 SW Birch St., Suite 200
                                             Newport Beach, CA 92660
                                             (949) 387-9595
                                             rm@mckennonlawgroup.com
                                             nw@mckennonlawgroup.com
                                             (Pro Hac Vice Motions to be filed)